Christian, J.,
delivered the opinion of the court.
This is an appeal from a decree of the Circuit court of Loudoun county. The plaintiffs in the court below, who aré the appellants in this court, are the children and the grand-children of George W. Carter and Mary B, his wife, who was Mai’y B. "Wormley. They seek to recover a tract of land, held by the defendants, which the plaintiffs claimed was settled upon their mother by a certain ante-nuptial deed, executed in the year 1812, which conferred upon their mother a life estate in said land, with remainder in fee to the children of the marriage.
Mrs. Carter died in December in the year 1865, and in March 1868 the bill of the plaintiffs was filed in the clerk’s office of the Circuit court of Loudoun. It is necessary to refer somewhat in detail to the allegations in the bill. It alleges that in August 1810, “a division of the real estate derived from John ’Wormley” (the father of said MaryB. Carter) “was made between his *312 said children and widow, whereby along with other property, three hundred acres, part of the Cool Spring ' tract, was allotted to the said Mary B. Wormley, subject to the life estate therein of her said mother; the said Mary Wormley, the mother and guardian of the said Mary B. Wormley, giving her consent to said division, and executing deeds of partition on behalf of her ward; which partition has ever since been acquiesced in by all the parties.* * * That in the year 1812, the said Mary B-. Wormley being still under the age of twenty-one years, and a marriage being about to be solemnized between the said Mary B. Wormley and George W. Carter, a deed of marriage settlement was duly executed, whereby the said Mary B. Womley, with the consent of the said George W. Carter and Mary Wormley her mother and guardian, conveyed all her property, real and personal, including the said three hundred acres of land, in strict marriage settlement, to the said Mary Wormley, in trust for the said Mary B. during her life, and after her death for the benefit of her children by the said George W. Carter; and in case she died without children, for the benefit of (her brothers) Hugh W. Wormley and John C. Wormley. Shortly after the execution of said deed of marriage settlement, the marriage between the said George W. Carter and Mary B. Wormley was duly solemnized.”
The bill further alleges that “no copy of said deed of marriage settlement is filed, because it was never recorded ; nor is said original deed of marriage settlement filed; because, after the said marriage, it was destroyed with the privity and by the procurement of David Castleman, jr., and Charles McCormick, purchasers of said tract of three hundred acres, as hereinafter set out. But said Castleman and McCormick had full notice of the *313 existence and contents of said deed of marriage settlement, as will presently be ¡drown.”
Then follows tbe allegation “ that some time after the said marriage the said Castleman and McCormick procured the said Geo. W. Carter and Mary B. his wife, and the said Mary Wormley, in her own right, and as trustee aforesaid, and Hugh W. Wormley, to enter into written articles of agreement, bearing dote tbe 13th day of September 1813, for the sale to them (Castleman and McCormick) of tbe said ihree hundred acres of land; * * * * that this agreement set out at length the manner in which the said Mary B. acquired title to said three hundred acres of land in fee simple, subject to the life estate therein of her mid. mother; as also the exist ence and contents of said ante-nuptial deed of marriage settlement. * * * * It also sets out an agreement between all the parties thereto, that the said marriage settlement should he annulled, rescinded, and rendered void; and that the said George W. Carter and his wife should enter into another marriage contract, whereby her estate should be settled upon her and him during their joint lives, with remainder to their children; and upon failure of issue, to mch uses as she by her will should appoint; that the . '.id tract-of three hundred acres of land should he a Id by the said Ma,ry Wormley, Geo. W. Carter and Mary B. his wife; and in lien thereof the said Guorge TM. Carter should settle the lands he had acquired from his i". tlier, Charles Carter, lying in the county of Culpeper, hi rhe manner agreed upon in relation to the estate of t! ■. said Mary B. Carter. By the said articles it was briber agreed, that'the said Mary Wormley, in her own right, and as trustee as aforesaid, should execute a deed, conveying said three hundred acres of land to Castleman and McCormick, with general warranty of tifio of her life estate therein, *314 and a warranty against all claim under said original deed ■ of marriage settlement; and that George W. Carter and MaryB. his wife, should join in said deed, with a general warranty of the remainder in fee simple; and should also give or procure approved real security for the title to be conveyed hy them.” That under this agreement, Castleman and McCormick were to pay forty-one dollars per acre, upon certain credits, and certain parts of which were to he paid to Mary Wormley, for her life estate. That in execution of this agreement, the land was conveyed by deed executed by Mary Wormley in her own right and as trustee, Geo. W. Carter and Mary B., his wife, together with Hugh and John C. Wormley, and was duly recorded, and Castleman and McCormick put in possession of the land.
The bill, after charging that the lands acquired from Charles Carter, lying in Culpeper county, were never settled upon Mrs. Carter, and no other real or personal estate, in lieu of the three hundred acres conveyed to Castleman and McCormick, alleges that “ Castleman and McCormick well knew of the existence and terms of said original deed of marriage settlement, and that they procured, or at least were privy to its destructionand that the said agreement and deed above referred to, were in fraud of the rights of the plaintiffs.” The bill further alleging,that in a division of property held in partnership by Castleman an d McCormick,- the said three hundred acres, known as Cool Spring, was allotted to McCormick, and upon his death was divided between his devisees, Francis McCormick and Hannah Taylor, who are now in possession of said three hundred acres; then insists “that the said Francis McCormick and Hannah Taylor are trustees, holding the legal title for the benefit of complainants; and that they are chargeable with the rents and profits of said land, since the death of the *315 said Mary B. Carter.” And the prayer of the hill is, “that they may respectively be decreed to account for the rents and profits of said land in their possession since the death of the said Mary B. Carter; and that they may be decreed to convey to complainants the legal title, and surrender the possession of said three hundred acres of land.” Then follows the usual prayer for general re-, lief, &c.
This bill is answered by Francis McCormick and Hannah Taylor, the defendants. They both deny all the material allegations of the plaintiffs’ bill, and call for strict proof of the same. They deny the existence of the ante-nuptial deed of settlement, as set up in the bill, and call for its production. They deny that Castleman and McCormick either procured or were privy to the annulling or destruction of any deed of marriage settlement between George ~W. Carter and Mary B. Carter. They affirm that Castleman and McCormick paid full value for the land,, (the three hundred acres called Cool Spring,) and that it had been in their possession and the devisees of McCormick, for the period of fifty-five years, their title unquestioned, and that they never heard of any claim being set up by complainants, or any one else, until a short time before the institution of this suit. They affirm that whatever may have been the character of the settlement referred to in the recital of .the deed conveying “Cool Spring” to Castleman and McCormick, the agreement set forth in that recital to substitute another tract of land in lieu of this tract, which was to be settled on Mrs. Mary B. Carter, was carried out, by the conveyance.to trustees of a tract of land in Culpeper; and they file deeds to show that this was done as far back as the year 1813; and that Mrs. Carter and the complainants had enjoyed the benefits of this conveyanee.
*316 They claim the benefit of all the equities arising in favor of purchasers who have paid full value, and who • have had quiet and uninterrupted possession under claim of title for upwards of fifty years.
The answer of Hannah Taylor, disclosing the fact that a part of the three hundred acres in controversy had been conveyed by her to Eliza Tucker, made it necessary for the complainants to file an amended bill, making new parties.
. The answer of Francis McCormick to the amended bill brings into the case, for the first time, a new and important fact, upon which the decision of the case must in a large degree turn. In that answer are the following statements, supported by the record evidence-filed therewith. “ Respondent is gratified in the opportunity offered by the filing of this amended bill, to present in the cause some additional facts, of which he was entirely ignorant and unsuspicious at the time of filing his former answer, which have come to his knowledge recently by mere accident, in the following manner. Having become the owner of the mansion house upon the “ Cool Spring” place, after the death of his late brother Cyrus, but being settled elsewhere, respondent has never resided there; but has had it occupied by tenants. * * * It was formerly the residence of the Wormley family, afterwards of Castleman and McCormick; and after the death of the former, of Charles McCormick, up to the period of his-death. * * * * A short time, ago, about .the last days of August 1868, the Messrs. McDonald, with their sisters, being about to remove from the place, upon the expiration of their tenancy, some old papers ■were found put away in a barrel; and one of the family, Mr. Marshall McDonald, (now married to a daughter of •respondent,) undertook to look over them. In so doing, he discovered some relating to the subject of this-suit, *317 and particularly one supposed to be the last “marriage contract.” * * * * Upon examination the supposed marriage contract was found to be a copy from the office of the clerk of Frederick county, (in which county the said land laid,) in the handwriting of the late Thomas A. Tidball, late clerk; but it seems only partly proved, although spread in full upon the proper record books of said office. It also appears (as respondent is advised) of no effect whatever, because never signed or executed by the alleged grantor, Mary 33. "Wormley, but only signed by her mother, Mary Wormley, and the intended husband, Mr. Carter. It further appears by the paper, that it was prepared and executed and witnessed and probably left with the clerk, all in Winchester, sixteen miles distant from “ Cool Spring,” where the intended bride was living, on the very day (as complainants’ evidence shows) she was married at “ Cool Springa fact well nigh conclusive that she never saw the paper. With this answer was filed a copy of the marriage settlement executed by Geo. W. Carter and Mary Wormley, but not by Mary 33. Wormley, the intended bride; and also the original articles of agreement executed by the above named parties with the said Castleman and McCormick, and the original deed executed by the same parties in pursuance of that agreement, conveying the “ Cool Spring” tract to Castleman and McCoimick.
It was proved that the exhibit of the “marriage contract” filed was a copy taken from the public records of the county of Frederick, which had been recorded, though only partly proven. It was also proved, that after long search among a great mass of papers, in an upper room of the clerk’s office, the original paper was found. That one reason why this search was made was because it “was conjectured” by one of the counsel, that the latter signature, “ Mary Wormley,” would be found *318 ■written, on the original “Mary B. Wormley;” but the original proved to be correctly copied on the record book, 1 and the name of Mary B. Wormley was not signed to the original, as it was not to the copy.
It was further proved that the original paper was in the handwriting of Archibald Magill, a lawyer, and that he and William Davidson and Samuel Kereheval, who witnessed the paper, all resided in the town of Winchester, the latter being a law student in Mr. Ma-gill’s office; and it was also proved that Cool Spring, the residence of MaryB. Wormley, was distant sixteen miles from Winchester.
It was also proved that the article of agreement above referred to, and the deed made in pursuance thereof, which conveyed the land in controversy to Castleman and McCormick, were both in the handwriting of Henry St. George Tucker, at that time a practicing lawyer residing in Winchester, and afterwards for many years the distinguished and learned president of this court.
It is also proved that the marriage contract executed by George W.' Cárter and Mary Wormley, attested by Magill, Davidson and Kereheval, all of whom lived in Winchester, bears date1 the same day on which Carter and Mary B. Wormley were married; and there is proof strongly, if not conclusively, tending to show that MaryB. Wormley remained at Cool Spring, while Carter and Mrs. Mary Wormley went to Winchester, and brought from thence with them the minister who was to perform the ceremony.
At the October term 1868, the cause came on to be heard, upon the bill, the amended bill, the answers thereto, the exhibits filed and the depositions of witnesses, and the arguments of counsel; añd thereupon the said Circuit court of Loudoun entered its decree dismissing the plaintiffs’ bills with costs. ’From this decree an appeal was allowed to this court.
*319 If the plaintiffs can maintain tlieir claim to recover from the defendants the land in controversy, it must rest solely on certain recitals contained in the agreement made with Oastleman and McCormick, „ above referred to, and 'also in the deed made in pursuance of that agreement, conveying the land in controversy to those parties. The only deed of settlement produced is' the deed of the 3d of October 1812; and outside of the recitals contained in the post-nuptial contract and deed referred to, there is not a particle of proof that any other ante-nuptial settlement ever existed. It is conceded that the deed of settlement of the 3d of October 1812 is a mere nullity. It was never signed by Mary B. ’Wormley; nor did it purport to be the deed of the mother as guardian of the daughter, but only in her character as trustee constituted by this same deed, and reserving her individual life estate in the three hundred acres conveyed.
But it is insisted by thedearned counsel for the appellants, in the elaborate and able arguments addressed to this court, that Oastleman and McCormick are estopped by the recitals in the agreement and the deed executed in pursuance thereof, from denying the existence of the ante-nuptial deed of settlement recited in said agreement and deed; and that they, being parties thereto, cannot set up or rely upon the deed of marriage settlement produced by the appellee, Francis McCormick, as the true deed of marriage settlement. It becomes important, therefore, to notice particularly the character, scope and effect of these recitals, so as to determine whether, according to the settled rules governing estoppels, they are of such a character as to preclude the appellees from showing the real and true nature of the marriage settlement, or that no deed of marriage settlement was ever perfected.
In the articles of agreement referred to, to which *320 Oastleman and McCormick were parties, they being articles of agreement “between Mrs. Mary Wormley, ‘ in her own right, of the first part; the said Mrs. Mary Wormley, as trustee for her daughter Mary B. Carter, of the second part; George W. Carter and Mary B. his wife; of the third part; John O. Wormley and Hugh W. Wormley of the fourth part; and David Oastleman and Charles McCormick of the fifth part, there is the following recitals: “And whereas, upon the proposed marriage of the said George W. Carter and the said Mary B. Wormley, all her property was by them- conveyed in strict marriage settlement, to the said Mary, her mother,' in trust, in substance as follows: that is to say, for the said Mary B. during-her life, and after her death for the benefit of her children by the said George W. Carter; and in case she die without issue, for the benefit of the said Hugh W. and John C. Wormley.”
In the deed between the said parties, executed in pursuance of said agreement, is contained the following recital: “And whereas a marriage some time since being about to be had and solemnized between the - said Geo. Washington Carter and Mary B. his present wife, then Mary B. Wormley, and who at that time was under the age of- twenty-one years, a certain marriage contract and settlement was made and entered into between the said George Washington Carter and the said Mary B. Wormley, now wife of the said George W. Carter, and the said Mary Wormley, her mother, whereby, among other things, the said George and Miry B., his intended wife, conveyed and transferred all the title and interest of the said Mary B., in the said tract of three hundred acres, together with other property, to the said Mary Wormley her mother, upon certain trusts in the said settlement set forth and declared; and among other things, in-trust-for the use of the said Mary B.-and the children of the *321 said Mary B.; and in case the said Mary B. should depart this life without children, then to the use and interest of John O. W'ormley and Hugh W. Wormley and their heirs.”
The claim of the .plaintiffs (enforced by much ingenuity and learning of their able counsel) is this: that the defendants in possession hold the land in controversy under Castleman and McCormick, who were parties to an agreement and deed, both of which recited an ante-nuptial deed of settlement, by which the land sold to them was settled upon the mother of the plaintiffs, (Mary B. Carter,) during her life, with remainder in fee to her children; and that being parties to that deed they took the land subject to the provisions of said marriage settlement, so recited; and that they are therefore estopped, either from showing that no such marriage settlement was ever executed, or that the real and true marriage settlement was different from the one recited, and was never executed by Mary B. Carter.
- The doctrine of estoppel, once tortured ’into a variety of absurd refinements, has, in a great measure, been reduced to consonancy with common sense and justice. In the language of Judge Gaston, in Jones v. Sassee, 1 Dev. & Bat. R. 464, “all estoppels, whether estoppels af common law or equitable estoppels, are founded upon the great principles of morality and public policy. Their purpose is to prevent that which deals in duplicity and inconsistency, and to establish some evidence as so conclusive a test of truth, that it- shall not be gainsaid. But as the effect of an estoppel may be to shut out the real truth by its artificial representative estoppels whether legal or equitable, are not to be extended by construction. Ho man is to be precluded from showing the truth of his claim or defence unless it .be forbidden by a positive rule of law.”
*322 . • There is certainly no positive rule of law growing out of the doctrine of estoppel, that would prevent either - party to this deed of September 1813, or those claiming under either party* to offer in evidence the deed of marriage settlement referred to in that deed; and if it can be shown that the deed of settlement of October 3d is the deed referred to in the recitals, though by mistake inaccurately described, that deed may be offered in evidence. "Whatever may 'be the effect at laxo of such a recital as the one relied upon, it is clear that in eqxiily the party may show that the recital was a mistake, and set up the true deed intended to be referred to. In a recent English case decided in 1868, it was held that a party to a deed is not estopped in equity from averring against, or offering evidence to controvert, a recital therein contrary to the fact which has been introduced into the deed by mistake of fact, and not through fraud or deception on his part. In delivering his opinion in this case, Lord Romilly, M. R., said: “There was simply a mistake of fact common to all the parties; and under these circumstances I am inclined to think there would be no estoppel at law, and certainly there is none in equity. Although an executor may execute a solemn deed saying: “ I have paid all the legacy duty on certain bequests,” amounting to a sum named, still, if he shows clearly that there is a mistake in the amount, and there is no fraud or deception in the case, I am of the opinion that in equity he is entitled to recover any further sum which he may have been properly called on to pay.” Brooke v. Haynes, 6 Eq. Cases, L. R. 1868, p. 24.
In Stoughton v. Lynch, 2 John Ch. R. 209, it was held that a recital in a deed founded on a mistake and untrue in fact, will not he allowed to operate by way of estoppel to exclude the truth satisfactorily shown to -the court.
*323 Iu the case befoi’e us it is easy to show that the unperfected deed of marriage settlement of the 3d of October 1812, is the deed of settlement referred to in the recitals contained in the deed of September 1813, conveying the land in controversy to Oastleman and McCormick; and that this was the only attempt at a marriage settlement made by the parties.
But it is objected by one of the learned counsel for the appellants, that the deed produced, known as the-Winchester deed, is not properly proved in the cause. This objection was not taken in the court below; but the deed was received and acted upon, by the court and the parties, as a paper properly received in evidence. The objection to its reception in evidence is made for the first time in this court.
We are of opinion that the deed produced is sufficiently proved for the purposes for which it is used. 1st: There is found upon the records of the clerk’s office of Frederick county a deed signed by George W. Carter and Mary Wormley, purporting to be a deed of marriage settlement between Geo. W. Carter, Mary B. Wormley and Mary Wormley, but signed cnly by George W. Carter and Mary Wormley. 2d: This deed was partly proven only; but it is conclusively shown that this deed is a copy of the original deed which was found among loose papers iu the said clerk's office; and that the original is the same as that recorded, and is in the handwriting of Mr. Magill, and witnessed by Kercheval and Davidson, the witnesses to the recorded deed. The evidence of Gibbons, the clerk, of S. C. Moore, who found the original, and the affidavit of Sherrard, all of which was received without objection in the court below, are, we think, amply sufficient testimony upon which to found the introduction of the deed relied on. Regarding the deed as properly in the case, *324 especially as its introduction was not objected to, we are constrained to say, that the proof is overwhelming to show that the deed produced by the defendant, McCormick, was the deed referred to in the recitals relied upon by the plaintiffs, and that no other deed of .marriage settlement was ever executed.
1st: This is the only deed produced. • 2d: This deed answers the general description of the deed referred to in the recitals relied upon 'by the appellants. The recital in the deed to Castleman and McCormick refers to a deed of settlement made on the eve of the proposed marriage of Geo. W. Carter and Mary B. Wormley. The deed produced bears date the very day of the marriage. The parties recited as such are named as parties to the deed produced. The property is the 3ame; -the limitations if not technically the same, bear a close' resemblance, and the ultimate remainders are the same. Both in the recitals and the deed produced, the- property, is settled upon Mrs. Carter during her life, with remainder in fee to her children; and if she died without issue, then in remainder over to her brothers. It is- true the deed produced was never signed by Mrs. Carter; and it is therefore insisted that this -is not the deed referred to in the recitals. The contract recites: “And whereas upon the proposed marriage-of the said George W. Carter and the said Mary B. Wormley, all- her property was by them conveyed in strict marriage settlement,” &c. The deed recites a cer. tain marriage contract and settlement entered into between the same parties, “'whereby the said George and Mary B., his intended wife, conveyed and transferred all -the - title and interest of the said Mary B. in the said tract of three hundred acres, with other property, to the said-Mary Wormley, her mother, upon certain trusts,” &c. It.-is said that the deed produced-is not-the deed *325 referred to, because Mrs Carter did not execute it, and it could not be said, as in the recitals, that she, with her husband, conveyed the property. But the deed produced, known as the Winchester deed, upon its face purported to be a deed between Mary B. Wormley of the first part and the other parties ; though she did not in fact sign it.'
It may fairly be presumed, from the fact that'the recitals in the deed and the recitals in the articles of agreement are not the same in words, if indeed they are of the same legal effect, and the use also of the words “in substance,” “upon certain trusts,” “among other things,” that the draughtsman of the deed of the 13th of September 1813 did not have before him the deed of marriage settlement referred to in the recitals; but it is most probable that the supposed settlement was described in the absence of any writing or memorandum, but merely from the recollection of the terms of settlement by the particular members of the Wormley family present at that settlement, who alone could know any thing about it. '
. The general description in the recitals, not purporting to be literal or accurate as if taken from a paper before the draughtsman at the time, showing many points of resemblance to the deed produced, and'the failure to produce or prove the existence of another, creates of itself a strong presumption that this deed is the deed of settlement referred to and recited in the deed of Sep tember 13th, 1813. The appellants can only maintain their claim upon the theory that there was another aud perfected deed of settlement. If there was, when -was it executed? Before the Winchester deed? If so, why was it.not put upon record? Why is it not referred to in the deed produced ? Why, indeed, was the imperfect settlement made and put upon record at all, if before that time a perfect deed of settlement had already been *326 executed? It is clear from all the circumstances that no deed of marriage settlement was executed before the • "Winchester deed of October 3d, 1812.
Was any deed of ante-nuptial settlement executed after that ? That there was, is almost a moral impossibility. The 3d day of October 1812, was the very day of the marriage. The deed of settlement was written, signed and witnessed in Winchester; a distance of 16 miles from the intended bi’ide's residence. It is proved that she was not in Winchester on that day, where the deed was written, signed by Geo. W. Carter and Mary Wormley, and witnessed. That it was written and executed on the day it purports to be, and that there ioas no time to execute another, is conclusively proved from the memorandum attached to the deed. That memorandum has reference to the conveyance upon the same trusts declared in this deed, of a certain tract of laud in the county of Lancaster containing six hundred acres. In the body of that memorandum is the following statement: “It was intended to have been in the body of the deed, but by mistake not mentioned to the drawer, and the parlies cannot delay until another be drawn.”
All these circumstances show conclusively, that no other deed of marriage settlement was or could have been executed on that day, before the marriage, which occurred on the evening of the same day. If there was, why is it not produced? Why was it not recorded? Why was the perfected deed of settlement suffered to remain unrecorded, while an imperfect settlement remained upon record ? (
How it must be borne in mind that there is not in the record any proof, or shadow of proof, that any other pre-nuptial settlement was ever made, or was ever heard of, except as such is established by the recitals in certain deeds and articles of agreement referred to. The *327 plaintiffs rest their whole case upon these recitals, and insist that they must-be taken as true, and that the defendants are estopped from denying them. It has been already shown that the recitals must refer to the Winchester deed, and that there was no other; and that these being the same parties, and the same property, and the same ultimate remainders, that the deed is sufficiently-identified as the deed referred to; and that the only-material discrepancy of .description is the fact that the deed produced was not executed by Mrs. Garter, while the recitals declare (not in terms) that she executed the deed, but that she, with her husband, conveyed the property upon certain trusts. And we have seen that upon reason and authority, a recital in a deed founded on a mistake, and untrue in fact, will not be allowed to operate by way of estoppel to exclude the truth satisfactorily shown to the court.
But we come now to consider the question how far Castleman and McCormick, and those under whom they claim, are to be bound by the recitals referred to. They are grantees in a deed in which there are numerous recitals of facts within the knowledge of the grantors only. There is not a particle of proof in the record that Castleman or McCormick ever knew of the existence of any contract, or deed of settlement, except at the date of the papers to which they were parties; and which they derived from the grantor’s.
The general rule, as often stated, that parties and privies are estopped from denying the recitals in a deed, when taken in its broad and literal sense, is not altogether accurate. ' ‘
The rule properly understood and more accurately stated, is this : where it can be collected from the deed that the parties to it have agreed upon a certain admitted . state of facts, as the basis on which they contract, *328 the statement of these facts, though but in the way of recitals, shall, estop the parties to aver the - contrary. See Toney v. Raincock, 7 Com. B. 336; Stoughell v. Buck, 68 Eng. C. L. R. 786; Borst v. Corey, 16 Barb. R. 136.
In Stoughell v. Buck, it was held, that “where a recital is intended to be a statement which all- the parties to a deed have mutually admitted to be ¡rue, it is an estoppel upon all. But where it is intended to.be the statement of one party only, the estoppel is- confined to that party; and the intention is to be gathered from construing the instrument.” Lookiug to the deed to Cast!ornan and McCormick, and in the absence of any proof, it is evident, upon a fair construction of the deed itself, that the recital of the existence of a. marriage settlement between the grantors, was a recital of facts within the knowledge of the grantors, and in'-which they alone had an interest. And so, too, the recital that it was the purpose of the parties to annul and render void the ante-nuptial settlement and substitute another, conveying in lieu thereof other property upon the same trusts, referí eel to a matter in which the grantors alone were interested, and to which the grantees were not and could not be parties, and in which they had no interest. -This is the fair construction to be gathered from the whole deed; and- the recital relied upon is not to be taken as the admission or affirmation of all the parties* but' only of the grantors.
A mere recital does not conclude all the parties; there must be a direct affirmation so-intended by all the parties, in order to bind all; and this intention may he gathered from the whole instrument.
It was held in Borst v. Corey (supra) that “ mere recital never concludes a party: there must be a direct affirmation. A recital by A. and B. will not estop or furnish evidence against 0., even though the latter bo a: *329 party to the instrument containing the recital; provided the recital does not purport to he of any fact within his knowledge, but relates to transactions between the other parties.” This case is one directly in point. The recital in the deed signed by Corey, as well as the other parties, was in reference (as in the case before us) to a marriage settlement entered into by the grantors. The recital was in these words: “Whereas, a marriage has lately been solemnized between said Martin and Rachel, and it having been agreed before said marriage between said parties thereto, that the sum of thirteen hundred dollars, the gross amount of the said Rachel’s right of dower in the real estate of her said former husband, now deceased, shall be secured to her separate use, in the manner hereinafter mentioned,” &c. Corey signed this deed;- but it was held he was not estopped from showing that there was no valid ante-nuptial settlement. The court says: “ This recital does not purport to be of any fact within the knowledge of the said Corey, nor does he affirm the truth of it in any respect. It is language applicable only to the other two parties, and is probably obligatory on them. So far from being an estoppel, the recital is not even evidence, as against Corey, of the fact therein recited. There being no evidence of an ante-nuptial agreement, Corey had the right to apply the funds to the payment of Borst’s honest debts, rather than apply them to a bond and warrant of attorney given in trust for his wife.”
The principles settled in this case, and others above referred to. apply with peculiar force to the case before us. The recital in this case was of a fact of which the grantees had no knowledge, and in which they had no interest; but of facts in -which the grantors were alone interested and peculiarly within their knowledge. Upon a true construction of the recitals in -the instruments re *330 lied upon, we are of opinion that there was no such solemn admission or distinct affirmation by the grantors ■ as will operate as an estop>pel upon them.
And we are further of opinion upon the evidence, that there never was but'owe deed of marriage'settlement, and that was the imperfect deed not executed by Mrs. Carter, known in the record as the Winchester deed; and that that was the deed referred to in the recitals, though by mistake described as a deed by which Mrs. Carter, with her husband, conveyed the land in controversy; when, in point of fact, she had never signed it. This mistake of recital maybe shown; and the parties, most.certainly the grantees, are not precluded from showing the true deed, and only deed of settlement.
It would be carrying the doctrine of estoppel to an absurd extent, and would be a monstrous perversion of justice, to hold that a court of equity is bound to set up a false and fictitious deed, merely because it had been inserted in the recitals of a deed, against the real and true deed, proven to be the only one in existence; and that, too, against purchasers for full value, who have been in possession of the property for upwards of fifty years.
. We are not willing to carry the doctrine of estoppel, which is founded upon the principles of morality and public policy, to that extent. The decree must be affirmed.
Decree affirmed.